IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

**BRIAN ALLEN OSBORNE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Macon County
No. 2011-CR-185   Brody N. Kane, Judge**

_____

**No. M2017-00521-CCA-R3-PC**

_____

The Petitioner, Brian Allen Osborne, appeals the post-conviction court's dismissal of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel.  After review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kara L. Everett (on appeal) and Samantha Key (at hearing), Carthage, Tennessee, for the appellant, Brian Allen Osborne.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Justin G. Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Petitioner was convicted of aggravated arson and sentenced to twenty years in the Department of Correction.  State v. Brian Allen Osborne, No. M2014-00352-CCA-R3-CD, 2015 WL 1059066, at *1 (Tenn. Crim. App. Mar. 9, 2015), perm. app. denied (Tenn. June 12, 2015).  His conviction and sentence were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal.  Id. at *1, *16-17.  This court recited the underlying facts of the Petitioner's case on direct appeal as follows:

*State's Case-in-Chief*

This case stems from an early morning fire that was started on the back porch of the [Petitioner]'s neighbors' home on April 10, 2011. At trial, Danny Hall testified that he lived on Oak Knob Road in Macon County and the [Petitioner] lived across the street. Mr. Hall was at home on the night of April 9, 2011, with his wife and adult son. Around 4:30 a.m. the following morning, Mr. Hall awoke to the sound of his dog barking. When he went into his living room, Mr. Hall saw the [Petitioner] standing in the doorway of his screened-in back porch holding a gas can. The porch was on fire, and the [Petitioner] was throwing gasoline onto the fire, making the flames worse. Mr. Hall quickly returned to his bedroom and told his wife that their house was on fire.

When they went outside to confront the [Petitioner], Mr. Hall saw that the [Petitioner] had thrown the gas can onto the porch and the gas can had caught fire. The [Petitioner] had a cane in his hand and was leaning against a post. The [Petitioner] did nothing to stop the spread of the fire or attempt to put it out. When Mr. Hall asked the [Petitioner] what he was doing, the [Petitioner] calmly said that he wanted to talk to Jeffrey, Mr. Hall's son. Although the [Petitioner]'s voice was clear and understandable, Mr. Hall thought that there was something wrong with the [Petitioner] because he was not acting like himself. The [Petitioner]'s eyes were "glassy looking," and he appeared to be holding himself up with the cane. Mr. Hall told the [Petitioner] that he was not waking up Jeffrey, and he asked why the [Petitioner] wanted to talk to Jeffrey. The [Petitioner] said, "[Jeffrey] was riding the four wheeler up and down the road keeping me awake." When Mr. Hall refused to wake up his son, the [Petitioner] "just turned around and walked off."

Mr. Hall removed the burning gas can from the porch and put it on the sidewalk. The porch fire eventually went out on its own, but the gas can continued to burn. When police arrived, they instructed Mr. Hall to pour water on the gas can to put out the fire. After the fire, Mr. Hall found a box of matches and a cigarette lighter on the back steps leading up to the screened-in porch, and he found a second cigarette lighter by the sidewalk in the back yard. Mr. Hall testified that he did not give the [Petitioner] permission to come to his house and start a fire, and he knew of no one else who would have told the [Petitioner] to do so.

- 2 -

Mr. Hall explained that the fire caused damage to the screened-in porch; it burned holes in the floor and blackened the ceiling, roof, and siding. Mr. Hall had to repaint everything on the porch and pressure wash the ceiling and siding. He also put down rugs to cover the holes that had been burned into the floor.

Priscilla Hall testified that she was in bed on the morning of the fire when her dog began barking around 4:30 a.m. Her husband got up and then returned to the bedroom, saying that their porch was on fire. When Mrs. Hall went outside, she saw the [Petitioner] standing on the back porch. A gas can was on the porch, and the porch and gas can were both on fire. The [Petitioner]'s eyes were glazed over, and he was standing back from the flames. The [Petitioner] repeatedly asked to see Jeffrey, but Mrs. Hall told the [Petitioner] that she was not waking up her son. She said that, if he did not get off her porch, she was calling the police. When the [Petitioner] did not move, Mrs. Hall called 911.

Mrs. Hall testified that she and her husband had lived in their house on Oak Knob Road for about six years. Up until that morning, they got along well with the [Petitioner], who lived across the street. Mrs. Hall testified that because she was inside the house calling police at the time, she did not know who took the gas can off the porch, but she believed that the [Petitioner] had tried to get the gas can off of the porch with his cane.

Deputy Kevin Templeton, with the Macon County Sheriff's Department, testified that he responded to the [Petitioner]'s residence after Mrs. Hall's 911 call. Deputy Templeton stayed near the front of the [Petitioner]'s house while Deputy Kyle Petty approached an open door at the side of the house. When he heard Deputy Petty yelling at the [Petitioner], Deputy Templeton came back around the house and helped take the [Petitioner] into custody. The [Petitioner] "was covered in [ ] black soot from the fire." The [Petitioner] was walking with a cane and appeared "disoriented" and "a little slow to react." Deputy Templeton testified, however, that it appeared that the [Petitioner] knew what was going on and was able to comply with officers' commands. After placing the [Petitioner] in a patrol car, Deputy Templeton noticed a truck sitting in the [Petitioner]'s driveway that had a siphoning hose hanging out of the gas tank. He also saw several gas cans and tools in the driveway and a box cutter near the front porch that appeared to have been used to cut the siphoning hose.

Deputy Kyle Petty, with the Macon County Sheriff's Department, testified that he arrested the [Petitioner] at his residence on the morning of April 10, 2011. At the time of his arrest, the [Petitioner] had black soot all over him. Deputy Petty also noticed that the [Petitioner] was clammy and sweaty, which the deputy recognized as a possible indicator of methamphetamine use. When Deputy Petty entered the [Petitioner]'s house to clear it for safety purposes, he did not see any drugs in plain view.

At the victim's residence, Deputy Petty saw a burned area on the back porch, which he described as "four feet worth of charring about two feet wide," and a melted gas can on the sidewalk. Mr. Hall told Deputy Petty that the [Petitioner] had attempted to pull the gas can off the porch with his cane after the Halls confronted him. Deputy Petty collected the melted gas can, a box of kitchen matches, and two cigarette lighters from the scene. He then transported the [Petitioner] to jail. The jail refused to admit the [Petitioner], however, until he was cleared medically so the [Petitioner] was taken to the hospital.

Chris Sanders testified that, around 10:00 p.m. on April 9, 2010, he was "riding around by [himself] drinking" when he spotted a patrol car from the sheriff's department. Mr. Sanders, who admittedly was "well into a half a case of beer" and intoxicated, decided to stop at the [Petitioner]'s residence to avoid the officer. While outside the house, Mr. Sanders told the [Petitioner] that he had just seen a patrol car and wanted to stay long enough for the officer to leave the area. When he was speaking to the [Petitioner], Mr. Sanders noticed that the [Petitioner] seemed "off kilter" and was dressed only in his underwear.

After the two men went inside the [Petitioner]'s home, the [Petitioner] asked Mr. Sanders why he had stopped at his house, and Mr. Sanders again told the [Petitioner] that he had stopped because of the patrol car. Mr. Sanders testified that the [Petitioner] was "very agitated" and was "intoxicated of sorts but not by alcohol." Mr. Sanders explained that, while he did not see the [Petitioner] drinking alcohol that night, he saw the [Petitioner] use methamphetamine. The [Petitioner] had the methamphetamine on his kitchen table and "snorted it up his nose" while Mr. Sanders was inside the residence. Mr. Sanders identified the substance as methamphetamine based upon his familiarity and history with the drug. Because of the [Petitioner]'s agitated behavior, Mr. Sanders left the residence after about an hour.

- 4 -

The following day, Mr. Sanders heard from his boss that the [Petitioner] had been arrested for setting fire to some property. Mr. Sanders told his boss and several other people that he had been at the [Petitioner]'s house the night before. He testified that he did not come forward to police because he had "no idea why the [Petitioner] tried to burn the house." About six or seven months after the incident, however, Mr. Sanders learned that the [Petitioner] was accusing him of putting something into the [Petitioner]'s drink the night before the fire. Mr. Sanders then contacted Deputy Petty and told the deputy that he did not give the [Petitioner] any drugs.

On cross-examination, Mr. Sanders stated that he knew nothing about plant food or bath salts, and he firmly denied telling Amanda Osborne that he put anything in the [Petitioner]'s beer. Mr. Sanders testified that he did not talk to Ms. Osborne following the [Petitioner]'s arrest but that Ms. Osborne sent him a text message, asking what had happened the night of the fire. The following colloquy then took place:

> Q: Did you text her back and say, I put some plant food in [the Petitioner's] beer?
>
> A: Never.
>
> Q: You didn't tell her that, I didn't think – I didn't want to hurt [the Petitioner], but I put some plant food in his beer?
>
> A: Never happened.
>
>       * * *
>
> Q: Did you ever communicate to her by text or any means whatsoever that you put something, plant food or something in [the Petitioner's] beer?
>
> A: So help me by the grace of God, no. That never happened. Those words never left my mouth or texted by my fingers on the phone that that ever happened. Why would I give that man anything?

*Jury–Out Hearings*

After the close of the State's case-in-chief, the [Petitioner] made an offer of proof concerning the proposed testimony of his ex-wife, Amanda Osborne. Ms. Osborne testified that she called Mr. Sanders after she learned that he had been at the [Petitioner]'s house the night before the fire. During the phone call, Mr. Sanders allegedly told Ms. Osborne, "That they had put salt – some kind of rock salt or something in one of [the Petitioner's] beers." Mr. Sanders further said, "That he didn't mean to hurt [the Petitioner] and he didn't realize that he would react that way" and that "apparently it caused [the Petitioner] to go a little crazy."

The State objected to Ms. Osborne's testimony about Mr. Sanders' alleged statement on the basis of hearsay, but the [Petitioner] argued that the testimony should be admitted for impeachment purposes as extrinsic evidence of a prior inconsistent statement under Rule 613. He asserted that the testimony "goes to [Mr. Sanders'] credibility." The trial court sustained the State's objection, finding that there was no hearsay exception under which the statement could be admitted. The trial court also determined that the statement was not admissible for impeachment purposes under Tennessee Rule of Evidence 613, stating, "It does not go to [Mr. Sanders'] credibility. You're trying to get it in so you can use it to get in an expert witness. That has nothing to do with credibility." The trial court further stated that the [Petitioner] was attempting to get Mr. Sanders' alleged statement "in the back door" and "use it as substantive evidence."

During a separate jury-out hearing, the [Petitioner] called Dr. Greg Elam. Dr. Elam reviewed the [Petitioner]'s medical records from his visit to the emergency room on April 10, 2011. The [Petitioner] was given a urine drug screen that showed the [Petitioner] tested positive for amphetamine use. Dr. Elam contacted the manufacturer of the test kit and found out the sensitivity and specificity of the kit. He explained that, because of the sensitivity of the particular test used, it would "pick up either amphetamine salts which can be prescription or a street drug, or methamphetamine salt or a variety thereof." Dr. Elam testified that he was familiar with bath salts, which he described as synthetic amphetamines. He testified, however, that it was "unknown" whether the test that the [Petitioner] was given would register amphetamine use based upon the [Petitioner]'s ingestion of bath salts. Dr. Elam stated:

> Most of the bath salts are so new that there hasn't been enough testing. In fact, they've not done specific testing. I

talked to the company about this and they've not done specific testing with some of the more common bath salts.

Following this testimony, the trial court found that Dr. Elam's proposed testimony regarding bath salts did not satisfy the requirements for admission under Rule 702 of the Tennessee Rules of Evidence. The court found that testimony on the [Petitioner]'s possible ingestion of bath salts would be speculative as the doctor testified that there had not been sufficient testing on bath salts to reach any conclusions from the particular drug test in evidence. The trial court further ruled that the [Petitioner] could not ask Dr. Elam about the behavior of people on bath salts until there was evidence presented that the [Petitioner] had used bath salts.

*[The Petitioner]'s Proof at Trial*

Amanda Osborne, the [Petitioner]'s ex-wife, testified that on April 9, 2011, the [Petitioner] took her to work at the Hartsville Convalescent Center between 10:30 p.m. and 11:00 p.m. Ms. Osborne explained that, when he took her to work that night, the [Petitioner] was fine. He spoke clearly and had no problems operating a car. While at work, Ms. Osborne and the [Petitioner] communicated normally by text message until about 1:00 a.m. Ms. Osborne stated that, at that time, the [Petitioner] "seemed fine." When she got off of work at 7:00 a.m[.] the following morning, however, the [Petitioner] was not there to pick her up. Ms. Osborne got a ride from a friend and went to the [Petitioner]'s residence. She saw that the [Petitioner]'s power tools were in the yard, which was unusual, and his truck had been left open. Ms. Osborne's SUV was sitting in the yard with the engine running. Ms. Osborne testified that she never saw the [Petitioner] use illegal drugs when they lived together.

Jennifer McGuffey, an LPN working at the Macon County jail, testified that on the morning of April 10, 2011, Sergeant Sharon Rackey called her at home. Sergeant Rackey informed Ms. McGuffey that there was an individual at the jail who "wasn't acting right" and was possibly under the influence of an intoxicant. When Ms. McGuffey responded to the jail around 6:30 a.m., she saw the [Petitioner], whom she knew, sitting on a bench in the booking room. The [Petitioner] was sweating and appeared to be hot. The [Petitioner]'s mouth was dry, and he had a white film covering his tongue. The [Petitioner] acted scared and appeared to be hallucinating. At one point, he told Ms. McGuffey, "[C]ome on, Jennifer, we gotta get out of here." Based upon her examination, Ms. McGuffey determined that the

[Petitioner] was under the influence and sent him to Macon County General Hospital for medical clearance. After the [Petitioner] returned to the jail around 8:45 a.m., Ms. McGuffey received a discharge report from the hospital, indicating that the [Petitioner]'s urine screen was positive for amphetamine use. The report stated that the [Petitioner] had been angry while answering questions posed by hospital staff but he acted appropriately otherwise.

Michael Duffer, a corrections officer with the Macon County Sheriff's Department, testified that he was working at the jail when the Defendant was brought in on the morning of April 10, 2011. Deputy Duffer recalled that the [Petitioner] smelled of alcohol and smoke and the [Petitioner]'s clothes had ash on them. The [Petitioner] could not stand on his own and seemed disoriented. The [Petitioner] did not know who he was or where he was, and he did not recognize Deputy Duffer, despite the fact that they had known each other for 15 years. Deputy Duffer testified that the [Petitioner] continued to seem disoriented for several days after his arrest.

Deputy Scotty Sutton testified that he was on duty at the Macon County jail when the [Petitioner] was brought in. Because it appeared that the [Petitioner] was "under the influence of something" and "pretty intoxicated," Deputy Sutton and another officer helped the [Petitioner] out of Deputy Petty's patrol car and brought him into the booking area. Deputy Sutton testified that, once inside the booking area, the [Petitioner] seemed to be hallucinating. The [Petitioner] asked to speak to Deputy Ethridge, but he was told that Deputy Ethridge did not work on weekends. The [Petitioner] then insisted that he had just talked to Deputy Ethridge in the basement of the jail even though the jail had no basement. Deputy Sutton testified that it took several days before the [Petitioner] could speak with clarity.

Melissa Smith, an office manager and nurse at Dr. Bowden Smith's office in Carthage, Tennessee, testified that Dr. Smith began treating the [Petitioner] in 2009. Ms. Smith explained that the [Petitioner] was drug tested once a month in order to ensure that the [Petitioner] was taking his medications as directed. The [Petitioner] took a drug test on March 21, 2011, and the test did not indicate positive for amphetamine use.

Dr. Greg Elam testified that he had reviewed the medical records from the [Petitioner]'s emergency room visit the day of his arrest. Dr.

Elam explained that the [Petitioner] was given a urine test to screen for drugs and, according to the drug screen, the [Petitioner] tested positive for amphetamines. Dr. Elam explained that the "amphetamines" result would include both amphetamine and methamphetamine because the particular test used by the hospital was designed to pick up both amphetamine and methamphetamine use.

Dr. Elam noted several clinical indicators that the [Petitioner] had amphetamine or methamphetamine in his system the morning of his arrest. The [Petitioner] was uncooperative and angry. His blood pressure was up, his pulse rate was irregular, and his potassium was low. Dr. Elam explained that these findings were consistent with someone being treated for stimulant abuse. Regarding the effects of amphetamine and methamphetamine on individuals, Dr. Elam testified that the drugs caused feelings of excitement, euphoria, omnipotence, and power. At higher doses, an individual could experience hallucinations, delusions or extreme paranoia and turn aggressive or violent.

On cross-examination, Dr. Elam testified that the [Petitioner]'s behavior at the jail was consistent with use of amphetamine or methamphetamine and that the lab report findings were consistent with the [Petitioner]'s having snorted methamphetamine the night before. He stated that methamphetamine could make an individual more angry and upset about things but would not prevent an individual from doing simple tasks. Dr. Elam agreed that methamphetamine use would not prevent someone from starting a fire if he or she wanted to do so.

Based upon the evidence presented, the jury found the [Petitioner] guilty of aggravated arson.

Id. at *1-5.

The Petitioner filed a timely petition for post-conviction relief in which he argued, as on appeal, that: he received ineffective assistance of counsel because trial counsel failed to inform him about and give him advice concerning a plea offer from the State, and failed to prepare him to testify at trial.

The post-conviction court conducted an evidentiary hearing on the Petitioner's issues. At the beginning of the hearing, the State advised the court that it had offered the Petitioner eight years. However, the victim objected, so the State called defense counsel within a day and rescinded the offer.

The Petitioner's trial counsel testified that he was appointed to represent the Petitioner and recalled meeting with the Petitioner "quite a few times" in preparation for trial. He sent the Petitioner for a mental health evaluation because the Petitioner did not remember much about the incident. Counsel recalled that the Petitioner sent him letters during the course of his representation and acknowledged that, after reviewing his case file, he came across an unopened letter from the Petitioner in which he requested assistance with having his recent marriage annulled. Counsel noted that he had received a similar request from the Petitioner before and had simply overlooked the last letter. Counsel said that he did not write letters back to the Petitioner but instead addressed any issues when they met in person. At some point, the Petitioner wrote counsel a letter expressing that he did not understand what was going on in his case, and counsel met with him to explain what was happening.

Counsel testified that he had a note in his file indicating that the prosecutor asked him to see if the Petitioner would be willing to plead to attempted aggravated arson for a sentence of eight to twelve years, and, if the Petitioner would, the prosecutor "would see if he could get the victim[] in the case to go along with it[.]" However, the prosecutor said that he would not approach the victim unless he knew the Petitioner was willing to plead. Counsel and co-counsel approached the Petitioner that day and had a "lengthy conversation" with him, but the Petitioner "didn't want to plead to anything." Counsel explained to the Petitioner that the State might be willing to negotiate between eight and twelve years, but the Petitioner said that he would not accept any plea, even if it meant he would "walk out of [jail] today[.]" Counsel recalled that the prosecutor faxed an offer of eight years to counsel's office, but the prosecutor called later that day and rescinded the offer because the victim objected. Counsel did not remember telling the Petitioner that the State had made an offer and then rescinded it, but he noted that the Petitioner did not want to plead anyway.

Counsel testified that he discussed the Petitioner's potential exposure if convicted at trial with him and that his sentence would be served at 100 percent. Counsel explained to the Petitioner that if he received an offer of eight years at thirty percent with time served, he would be close to a release date. Counsel recalled that he discussed pleading with the Petitioner at different times throughout his representation.

Counsel testified that he and the Petitioner discussed whether the Petitioner would testify on various occasions, and counsel "thought he should testify actually, but [the Petitioner] never indicated that he wanted to testify." Counsel specifically recalled that they talked about it during the same meeting in which they discussed a possible plea offer. Counsel explained the benefits and drawbacks of testifying to the Petitioner and advised the Petitioner that he was the only person who could really express that he was involuntarily intoxicated when the incident occurred. Counsel said that he wanted the

Petitioner to testify because the Petitioner did not have a bad criminal record and "it was going to be hard to get his point across" without him doing so. However, the Petitioner insisted that he did not remember what happened on the night in question. Counsel stated on the record at trial that he thought it would be advantageous for the Petitioner to testify but that the Petitioner had chosen not to do so. Counsel acknowledged that he did not take the Petitioner into the courtroom to sit on the witness stand as an aid to help him make the decision of whether to testify.

The Petitioner testified that he was represented by counsel and co-counsel in his aggravated arson case, and he thought he "could have had a better counsel." He specifically felt that counsel could have done a better job of preparing him for trial, advising him on the status of his case, and letting him know about an offer made by the State. He recalled that there were times when he was ready for court, but it would be continued, and he did not know why. He claimed that counsel did not explain to him how a trial worked. The Petitioner said that counsel only visited him one time to prepare for trial and that was on the day before it started. He sent counsel multiple letters and left messages for counsel, but counsel did not write him back or return his calls.

The Petitioner testified that he was not told about a plea offer in his case and felt that it was important for him to know about the offer even if it had been withdrawn. He said that counsel did not explain to him the sentencing range for his crime or that his sentence would be served at 100% if convicted. He claimed that had counsel explained things more thoroughly, he would have considered taking a plea. Specifically, he stated that he would have considered taking an offer of eight to twelve years with release eligibility because he "would have done had the time served on it."

The Petitioner testified that the only time counsel discussed whether he would testify was the day before trial, and the entire conversation lasted about fifteen minutes. He said that did not know what to expect and felt put on the spot. He denied that counsel explained to him the benefits and possible consequences of testifying, that his testimony might be important to his defense, and that his state of mind was the only truly contested issue in the case. The Petitioner felt that the lack of preparation prejudiced the outcome of his trial because he would have testified had he understood the process. The Petitioner said that he sent counsel a letter asking him to withdraw if counsel did not have time to represent him.

On cross-examination, the Petitioner acknowledged that he had pled guilty in previous cases and therefore had "courtroom experience." He denied telling counsel that he had no recollection of the night in question. He admitted that he told the trial court that it was his decision not to testify.

The Petitioner's co-counsel testified that the State made an offer that it quickly rescinded due to the victim's objecting to it. Right before trial, he and counsel visited the Petitioner in jail to ascertain, at the State's bequest, if he would take an offer of eight to twelve years. They spent thirty to forty-five minutes discussing a potential plea. The Petitioner, however, "didn't want to plead to anything." Co-counsel noted that he was not present every time counsel met with the Petitioner "because [counsel] talked to [the Petitioner] a lot of other times," but he was present when the Petitioner "indicated he wouldn't take anything even if he could leave jail that day . . . time served and all." Co-counsel said that the Petitioner "knew what he was facing."

Co-counsel testified that in his and counsel's discussions with the Petitioner, the Petitioner indicated that he did not want to testify even though they felt that his testimony would be the best way to establish a defense. The Petitioner stated that he "didn't have anything he could testify to." During the time leading up to trial, counsel and co-counsel talked with the Petitioner about the matters to which he could testify. Co-counsel reiterated that they discussed with the Petitioner on several occasions about whether he would testify, and the Petitioner consistently advised that he did not want to testify.

After the hearing, the post-conviction court entered a written order in which it addressed the Petitioner's allegations and, determining that he was not entitled to relief, dismissed the petition. The Petitioner appealed.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v.

<u>Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>State v. Taylor</u>, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The <u>Strickland</u> standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Courts need not approach the <u>Strickland</u> test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; <u>see also</u> <u>Goad</u>, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

With regard to the Petitioner's claim that counsel failed to inform him about and give him advice concerning a plea offer from the State, the State advised the post-conviction court that it had offered the Petitioner eight years, but it rescinded the offer within a day because the victim objected.  Counsel testified that he discussed pleading with the Petitioner at different times during the course of his representation and explained the range of punishment the Petitioner faced.  Counsel did not recall whether he informed the Petitioner that an offer had been made and quickly rescinded, but, nevertheless, the Petitioner had consistently stated that he would not take a plea offer.  Co-counsel confirmed that after speaking with the Petitioner for thirty to forty-five minutes, the Petitioner maintained that he would not plead to anything even if he would be released on time served.  The post-conviction court specifically accredited the testimony of counsel

and co-counsel, finding them "to be more believable and trustworthy" than the Petitioner. As to this issue, the post-conviction court found that "irrespective of [the] Petitioner's stated refusal to take any plea bargain," the offer was "a moot point as it had been revoked by the State." The Petitioner has failed to prove any deficiency in counsel's performance because the offer was rescinded before counsel had an opportunity to convey it. The Petitioner has also failed to prove prejudice because there was no offer for him to accept, and, even if there was, he had maintained that he would not accept a plea.

With regard to his claim that counsel failed to prepare him to testify at trial, the Petitioner admitted that he told the trial court that it was his decision not to testify. Counsel testified that he and the Petitioner discussed whether the Petitioner would testify on various occasions. He advised the Petitioner of the advantages and disadvantages of testifying, as well as reviewed the information that he believed the Petitioner could testify about to assist in his defense. However, the Petitioner insisted that he did not remember what happened on the night in question. Counsel recalled that he stated on the record at trial that he thought it would be advantageous for the Petitioner to testify but that the Petitioner had chosen not to do so. Co-counsel testified that the Petitioner indicated that he did not want to testify, even though he and counsel felt that the Petitioner's testimony was the best way to establish a defense. Co-counsel reiterated that they discussed with the Petitioner on several occasions about whether he would testify, and the Petitioner consistently advised that he did not want to testify. As to this issue, the post-conviction court accredited the testimony of counsel and co-counsel and found that the Petitioner failed to establish that counsel's performance was deficient or that the Petitioner was prejudiced as a result of an alleged deficiency. The record supports this determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.

_____
ALAN E. GLENN, JUDGE

- 14 -